North Carolina Equipment Company v. Commissioner.
North Carolina Equip. Co. v. Commissioner
Docket No. 4737.
United States Tax Court
1945 Tax Ct. Memo LEXIS 177; 4 T.C.M. (CCH) 582; T.C.M. (RIA) 45202; June 4, 1945
Edgar J. Goodrich, Esq., Washington, D.C., and C. E. Elberson, C.P.A., Winston-Salem, N.C., for the petitioner. George J. LeBlanc, Esq., and P. A. Bayer, Esq., for the respondent. SMITH
Memorandum Findings of Fact and Opinion SMITH, Judge: This proceeding involves deficiencies in income and excess profits tax for 1941 as follows: Deficiency
Income Tax
$ 9,537.28
Declared Value Excess-Profits Tax
5,433.37
Excess-Profits Tax
29,243.80
The principal question in issue is the deduction to which petitioner is entitled as reasonable compensation for its president for the taxable year 1941. Findings of Fact Petitioner is a North Carolina corporation, organized on February 1, 1937. It filed as income and declared value excess-profits tax return for 1941 *178 with the collector of internal revenue for the district of North Carolina, at Greensboro. Petitioner's business is sales agent and distributor of various types of machinery used for road building, grading, and construction work. It is one of the largest distributors of such equipment. It handles the products of a number of different manufacturers including International Harvester Co., Euclid Road Machinery Co., Bucyrus-Erie Co., Jaeger Machinery Co., Galion Iron Works & Manufacturing Co., and other leading manufacturers. Petitioner's principal lines of equipment are nationally advertised and are well known to the trade. It has its main office and plant at Raleigh, North Carolina, and several branch offices in that and other southeastern states. Altogether petitioner operates in five states, North Carolina, South Carolina, Virginia, Georgia and Florida. It has the exclusive agency in certain designated sections of those states for one or more of the products which it handles. Petitioner succeeded to the business of a partnership which had operated under the same name since 1931. The partnership was composed of A. E. Finley, who became petitioner's president and general manager, *179 H. A. Mooneyham and J. M. Gregory, all equal partners. The partnership operated in the name of "A. E. Finley trading as North Carolina Equipment Company." Finley was the only active partner. He and his two inactive partners contributed only $3,500 capital to the new venture. No further contributions to capital were ever made either to the partnership or to the successor corporation, this petitioner. A. E. Finley entered the equipment business in 1924 when he was first employed by the General Utilities Co., Norfolk, Virginia, as office manager. The General Utilities Co. was a distributor of road machinery, construction equipment, contractors' supplies, municipal and highway equipment. Finley became a salesman of this company for the eastern district of North Carolina in 1925. His compensation was $225 (later $250) per month plus 25 percent of the net profits upon equipment sold in his teritory, whether the sale was made by him or not. At the same time another salesman employed by the same company covering the western district of North Carolina was paid at the same rate, that is, a fixed salary plus 25 percent of the profits from his territory, and the president of General Utilities *180 Co. received as compensation for his services 50 percent of the net profits of the company after the deduction of all expenses. In 1928 Finley and two others formed a company which obtained the agency for caterpillar tractors. It operated under the name of North Carolina Equipment Co. In 1929 Finley, Mooneyham and Gregory organized the Raleigh Tractor & Equipment Co. with headquarters at Raleigh, N.C., for the sale of caterpillar tractors. These three men had an equal interest in the company. In 1931 Finley obtained a contract for the sale of the products of Galion Iron Works & Manufacturing Co. in the State of North Carolina. He requested his associates to permit him to devote his entire time and energies to the promotion of sales of road construction machinery and equipment and to carry on this business separately from that of the Raleigh Tractor & Equipment Co. This request was granted and the $3,500 above referred to was invested by Finley and his two associates to launch the new company. Finley still retained his one-third interest in the Raleigh Tractor & Equipment Co. which continued to be operated by Mooneyham and Gregory. Gregory had formerly been a road contractor and *181 was anxious to get back into that line of business. In 1932 or 1933 he formed a company to engage in such business. Finley and Mooneyham each had a proprietary interest in that company. After the organization of Gregory's companythe Raleigh Tractor & Equipment Co. was operated by Mooneyham. But the three associates each had an interest in the company operated by each. Finley, operating under the name of A. E. Finley trading as North Carolina Equipment Company, through his personal connections and efforts obtained exclusive territorial sales agency contracts from a number of leading manufacturers of complementary lines of equipment and using his prior experience in selling road construction machinery and equipment set about exploiting these franchises for the benefit of his company. Because these exclusive agency contracts renewable from year to year had been granted to Finley personally and because his personal efforts at exploiting them showed immediate results and because Finley alone undertook the operation of the new venture, it was agreed in 1934 among the partners that Finley should receive as compensation a small fixed salary plus 25 per cent of the net profits of the business *182 before any division of the profits among the partners. At the same time it was agreed that each of the other partners should have a similar bonus from the profits of the separate business each managed as a reward for his efforts and the results obtained. This agreement was reduced to writing on July 27, 1934. In the latter part of 1936 Finley, Mooneyham and Gregory agreed to incorporate the business which was being conducted by Finley. Finley insisted that if he was to continue single-handed the whole management, including financing of the new company and the exploitation of agency contracts which he had obtained individually, he should have stock control of the new company to the extent of approximately 51 percent. This was agreed to by Mooneyham and Gregory and Finley was permitted to acquire from them a part of their interests in the business. During the year 1941 there were outstanding 107 shares of common stock of the petitioner having a par value of $1,000 each or a total of $107,000, which were held as follows: Number
of Shares
A. E. Finley, Pres. and Dir.
54
K. C. Eller, Vice-Pres. and Dir.
1
W. C. Calton, Vice-Pres. and Dir.
1
H. A. Mooneyham, Vice-Pres. and Dir.
24
W. L. Smith, Vice-Pres. and Dir.
1
H. B. Hatch, Sec'y-Treas. and Dir.
1
J. M. Gregory
25
107
*183 It was also understood by the organizers of the petitioner that the same method of compensation of Finley should be continued, that is, he was to receive a small stated salary and in addition thereto 25 percent of the net profits. As president and active general manager of the petitioner corporation in the taxable year 1941, as well as all prior years, Finley arranged for all the working funds necessary to the corporation's operations by personally obtaining and underwriting all loans needed for expansion. He also obtained renewals of all exclusive territorial distributing contracts none of which has ever been rescinded. In dealing with the petitioner corporation the manufacturers have always looked to Finley as the man with whom they were dealing and it was immaterial to them whether the contracts were with him personally or with the corporation. Finley has always dominated the business policies of the petitioner; obtained all additional territories; fixed the terms on all sales andthe trade-in values on equipment in all branches of the business. He has been responsible for the "hiring and firing" and training of personnel and has always fixed their compensation; directed all *184 sales; and in many instances called personally on customers with or without his salesmen in the territory; handled and planned all advertising, opening of new branches, and made all arrangements for the acquisition of new buildings, shop equipment and the organization of each branch of the business. He has also personally considered and passed upon every deal involving a "trade-in" of used equipment. This is an important function of management. By using good judgment he has voided a common pitfall of such businesses as that of the petitioner of accumulating a lot of used and unsaleable secondhand machinery and equipment. Over a period of years including 1941 Finley has devoted his entire time and energies to the building up of petitioner's business. He is in constant telegraphic and telephonic communication with the seven main offices of the farflung business of the petitioner and during 1941 the telegraph and telephone bills alone were in excess of $25,000. In 1940 the total net sales of the petitioner were $1,729,298.91 and in 1941 $3,572,324.71. This sharp increase was due in part to the fact that petitioner's sales territory was greatly increased in 1941 and to the fact that *185 certain new equipment sold extremely well. In 1940 petitioner held exclusive contracts for only the State of North Carolina. Late in 1940 Finley personally obtained as additional territory for the principal lines of equipment five counties in Virginia, all of South Carolina, and parts of Georgia and Florida. Petitioner's comparative balance sheet for the years 1937 to 1941 shows for each year as follows: ASSETS
12/31/37
12/31/38
12/31/39
12/31/40
12/31/41
CURRENT ASSETS: Cash
$ 21,812.10
$ 18,353.37
$ 19,683.52
$ 56,123.99
$ 119,759.52
Notes Receivable
43,516.48
61,452.20
47,214.38
74,463.98
123,168.13
Accounts Receivable Less Reserve
87,908.30
66,747.91
98,503.91
277,872.46
230,324.90
Inventories
32,914.86
53,723.50
95,371.85
171,167.03
627,556.84
$186,151.74
$200,276.98
$260,773.66
$579,627.46
$1,100,809.39
FIXED ASSETS: Land, Buildings and Equipment
$ 44,992.73
$ 53,973.70
$ 52,200.08
$ 87,724.17
$ 108,035.30
Less Reserve for Depreciation
2,277.30
6,087.60
9,045.17
13,405.33
19,336.26
$ 42,715.43
$ 47,887.10
$ 43,154.91
$ 74,318.84
$ 88,699.04
OTHER ASSETS
$ 42,759.64
$ 41,321.90
$ 3,222.56
$ 3,441.20
$ 4,261.16
TOTAL
$271,626.81
$289,484.98
$307,151.13
$657,387.50
$1,193,769.59
LIABILITIES
CURRENT LIABILITIES: Notes Payable
$ 47,275.48
$ 51,175.75
$ 53,376.40
$126,393.50
$ 496,474.22
Accounts Payable
60,652.72
47,377.41
40,447.54
264,623.80
221,356.75
Accrued Expenses and Unearned
Income
320.50
19,716.01
29,091.63
33,965.31
164,227.15
$108,248.70
$118,269.17
$122,915.57
$424,982.61
$ 882,058.12
CAPITAL ACCOUNTS: Capital Stock - Common
$143,000.00
$143,000.00
$105,000.00
$105,000.00
$ 107,000.00
Surplus - Paid in
21,450.00
21,450.00
21,450.00
21,450.00
Surplus - Earned
(1,071.89)
6,765.81
57,785.56
105,954.89
204,711.47
$163,378.11
$171,215.81
$184,235.56
$232,404.89
$ 311,711.47
TOTAL
$271,626.81
$289,484.98
$307,151.13
$657,387.50
$1,193,769.59
*186 The following table is a summary of petitioner's entire operations from the date of its organization until the close of 1941: 1937 *
1938
1939
1940
1941
Net Sales
$748,414.71
$805,433.52
$1,079,860.17
$1,729,298.91
$3,572,324.71
Cost of Sales
603,944.34
648,773.68
874,004.92
1,455,549.86
2,885,184.77
Gross Profit on Sales
$144,470.37
$156,659.84
$ 205,855.25
$ 273,749.05
$ 687,139.94
Income from Commissions
20,436.25
15,243.51
18,119.47
23,664.45
27,880.19
Other Income
7,831.76
11,953.58
12,061.83
23,631.82
69,642.59
Total Income
$172,738.38
$183,856.93
$ 236,036.55
$ 321,045.32
$ 784,662.72
Officers' Salaries, etc.
$ 40,052.78
$ 35,807.64
$ 48,172.62
$ 72,235.53
$ 168,686.20
Other Salaries and Wages
29,792.85
41,469.61
48,743.88
60,993.20
134,337.48
Other Expense
63,446.44
80,256.05
77,657.26
105,914.40
214,648.95
Total Expense
$133,292.07
$157,533.30
$ 174,573.76
$ 239,143.13
$ 517,672.63
Net Income Before Income Taxes
$ 39,446.31
$ 26,323.63
$ 61,462.79
$ 81,902.19
$ 266,990.09
Income Taxes
7,533.56
5,470.27
14,082.09
29,697.40
157,708.58
Net Income After Income Taxes
$ 31,912.75
$ 20,853.36
$ 47,380.70
$ 52,204.79
$ 109,281.51
Dividends Paid
$ 28,600.00
$ 5,720.00
$ 6,300.00
$ 6,300.00
$ 10,700.00
*187 The amounts of compensation, including fixed salary and bonus, which petitioner paid to Finley during the years 1937 to 1941, inclusive, were as follows: Fixed
Additional
Total
Year
Salary
Compensation
Compensation
1937 (11 months)
$3,850.00
$20,000.00
$23,850.00
1938
4,400.00
13,200.00
17,600.00
1939
5,100.00
19,937.64
25,037.64
1940
6,000.00
33,033.71
39,033.71
1941
6,900.00
95,353.61
102,253.61
During the same period other officers of the petitioner received the following compensation, including both salary and bonus: 1937
Officer
(11 mos.)
1938
1939
1940
1941
Officer
K. C. Eller
$ 5,602.78
$ 6,115.01
$ 7,656.91
$11,576.22
$18,950.00
W. C. Calton
3,300.00
5,852.63
7,587.53
10,206.74
15,950.00
H. B. Hatch
3,300.00
6,240.00
7,587.53
10,206.74
23,020.72
H. A. Mooneyham
303.01
1,212.12
1,212.12
W. L. Smith
7,299.75
Total
$16,202.78
$18,207.64
$23,134.98
$33,201.82
$66,432.59
It is a common practice for distributors of such products as those sold by the petitioner to compensate keyman and salesmen by paying them a small fixed salary *188 and a share of net profits from the business arising in the territories assigned them. In some cases the net profits paid as a bonus reach as high as 50 percent. This bonus is often referred to as "incentive compensation." Petitioner pays not only its president but other officers and keymen "incentive compensation." The phenomenal growth of the petitioner is largely attributable to such method of compensation. Other officers and employees of the petitioner corporation, in addition to those whose compensation is shown in the tabulation above, received fixed salaries and bonuses in 1941 in amounts of from $5,000 to $10,000 per year. The salesmen received salaries of about $250 per month, plus bonuses of about $2,000 per year. The amounts of all salaries and bonuses were determined by Finley according to his own judgment and his knowledge of the services performed by each of the recipients. A resolution fixing the compensation of all the officers was passed at a meeting of the directors held on December 18, 1937. The minutes of that meeting read in part as follows: "The President brought to the attention of the Board the fact that the compensation for services rendered to be paid *189 to the President, Vice President, Secretary and Treasurer had not been made a matter of record in the minutes of the Corporation. Whereupon, the following resolution was made and duly adopted: "WHEREAS, at the beginning of business of the North Carolina Equipment Company as a corporation on the date of February 1, 1937 there existed an agreement as to the compensation to be paid to the President, Vice President, Secretary and Treasurer in the amounts stated below: "BE IT RESOLVED, That the Board of Directors now do declare that the schedule of compensation listed below has been in effect during the year 1937 and do hereby declare this schedule to be in full force and effect at this time and direct the Treasurer to make payments to the officers of the corporation in accordance therewith: "A. E. Finley, President - Salary of $4250.00 per annum payable at the rate of $350.00 per month; plus 25% of the net profits of the corporation for the fiscal period. "K. C. Eller, Vice President - Salary of $3000.00 per annum payable at the rate of $250.00 per month; plus 20% of the net profits of the branch office located in Statesville, N.C. for the fiscal period. "H. B. Hatch, Treasurer *190 - Salary of $3600.00 per annum payable at the rate of $300.00 per month; plus 5% of the net profits of the North Carolina Equipment Company for the fiscal period. "W. C. Calton, Secretary - Salary of $3000.00 per annum payable at the rate of $250.00 per month; plus 20% of the net profits of the territory assigned to him for the fiscal period. "The following resolution on motion was duly adopted: "RESOLVED, That the President be authorized to pay such bonus and to make such gifts at Christmas 1937 to employees of the Company as in his judgment are warranted. * * * * *
"RESOLVED, That the same salaries and commissions applicable to the year 1937 as set forth in the minutes of this meeting be and are hereby adopted to apply for the year 1938." Similar resolutions were adopted by the directors each year thereafter. The officers' compensation for 1941 was fixed at a meeting of the directors, consisting of Finley, Hatch and Calton, held on January 28, 1941. The resolution reads in part as follows: "BE IT RESOLVED: That the Board of Directors do now declare the following schedule of compensation of the Officers for the Year 1941, as follows: "Mr. A. E. Finley, President, *191 - Salary of $6900. per annum, payable $500.00 per month for the first three months of the year and $600.00 per month for the remaining nine months, the additional $100.00 per month during these nine months to be paid from the Florida-Georgia Tractor Company; and in addition, 25% of the net profits of the Corporation for the fiscal year. "Mr. H. A. Mooneyham, Vice-President, a salary of $1212.12 per annum, payable at the rate of $101.01 per month "That Mr. A. E. Finley, as President of the Corporation, be and he is hereby empowered to set the rate of pay of each of the other officers; 5amely, K. C. Eller, Vice President; W. C. Calton, Vice President; and W. L. Smith, Vice President. Such rates of pay shall be left to the sound discretion of the President; and his actions in such matters are hereby ratified and adopted by the Board of Directors as official. "Mr. H. B. Hatch, Secretary-Treasurer - Salary of $3600.00 per annum, payable at the rate of $300.00 per month, plus 5% of the net profits from the Corporation
"The percentage of profits of the Corporation payable to Mr. A. E. Finley, Mr. W. C. Calton and Mr. H. B. Hatch are to be computed after deducting all other expenses *192 of the Corporation, including all other bonus paid. "The President is authorized and directed to set aside monthly from the profits of the Corporation a reserve from which may be paid to the employees of the Corporation such bonus as in his judgment is fitting for the services rendered." The petitioner and Finley both keep their accounts and make their income tax returns on the accrual basis. Petitioner accrued and deducted in its return for 1941 the entire amount of Finley's compensation for that year, $102,253.61, and Finley reported that amount in his 1941 return. The respondent in his audit of the return allowed the deduction of $40,000 as a reasonable compensation for Finley and disallowed the balance of $62,253.61. Reasonable compensation for services rendered by Finley to the petitioner corporation for 1941 is the amount of his fixed salary, $6,900, plus 25 percent of the net profits of the business, computed in accordance with the resolution of the board of directors incorporated herein. During 1939 petitioner sold a parcel of improved real estate at a loss of $3,509.64, the difference between the sale price and the adjusted cost basis. The real estate in question had *193 been used by the petitioner in handling farm machinery under its contract with International Harvester Co. Petitioner found it unprofitable to handle farm machinery and discontinued that line. In 1939 it sold the property incurring the loss of $3,509.64, $1,095.91 of which is allocable to the land and the balance $2,413.73, is allocable to the buildings. The loss was allowed as a deduction of that year. In computing petitioner's excess profits credit for 1941, under the income credit method, the respondent added back to the normal tax net income for 1939 (for determining the average base period net income) that portion of the loss allocable to the land, but did not add back that portion, $2,413.73, allocable to the depreciable buildings located on the property, Petitioner alleges that the respondent erred by not also adding back the loss on the sale of the buildings. Opinion Section 23 (a), Internal Revenue Code, authorizes the deduction from gross income of: * * * All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal *194 services actually rendered; * * * The respondent contends that the total compensation paid to A. E. Finley, the petitioner's president, for 1941 in the aggregate amount of $102,253.61 was in excess of reasonable compensation for services rendered to the extent of $62,253.61 and that the payment of such excess partakes of the nature of a distribution of profits to petitioner's principal stockholder and that therefore it is not a legal deductions from gross income. Petitioner's contentions are twofold: First, that Finley's compensation in the amount of $102,253.61 was paid pursuant to a valid agreement for the payment of compensation, and, second, that the amount thereof was reasonable in view of the personal services which Finley actually rendered, the results accomplished over a period of years, and by comparison with the compensation paid executives in similar enterprises. The payment of "incentive" compensation such as that paid by the petitioner to Finley has been said to be based upon sound business principles in that it stimulates the "activity, diligence, and ambition of the employees" and enables the corporation justly to compensate its employees without beforehand incurring *195 the obligation. Gray & Co. v. United States (Ct. Cls.), 35 Fed. (2d) 968. The respondent has recognized the prevalency of the custom, if not admitting its merit, in his promulgated regulations. Article 19.23 (a)-6 of Regulations 103 provides in part as follows: (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentaily on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) In any event the allowance for the compensation paid may not exceed what is *196 reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned. We are of the opinion that the question presently being considered must be determined upon the basis of the reasonableness of the agreement which existed between Finley, Mooneyham and Gregory at the date that it was entered into, namely, in the year 1934. At that time Mooneyham and Gregory had contributed each only one-third of the $3,500 used to launch the business. They never contributed additional capital and never rendered important services to the business. Its success depended almost entirely upon the brains, efforts and energy of Finley. He not only acted as salesman but was also at all times the chief active officer and guiding genius. He personally obtained the exclusive sales contracts, trained and supervised the salesmen and obtained the credit upon which the business was *197 carried on and expanded. For such services he agreed with his associates that he should receive as compensation a small fixed salary plus 25 percent of the net profits. We think that in every sense this was a reasonable agreement. It allowed approximately 75 percent of the net profits to be divided among the three as earnings upon their capital investment. Mooneyham and Gregory had every reason to be satisfied with the arrangement and the evidence is that they were. They were also satisfied to continue the arrangement upon the organization of the corporation. The respondent suggests that the arrangement was originally entered into upon consideration that Mooneyham and Gregory should also have like compensation from their own companies. The evidence shows, however, that the arrangement was suggested by Finley and that he was interested only in obtaining reasonable compensation for his services. In proposing the arrangement he suggested that Mooneyham and Gregory were each entitled to like compensation from the businesses operated by them. Late in 1934 Gregory acquired the interests of Finley and Mooneyham in his separate company and the arrangement with respect to compensation which *198 he should receive from his own company was thereby abrogated. Respondent further suggests that the agreement entered into in 1934 was not an enforceable contract and therefore was not within the purview of his regulations quoted above. We do not think it is material whether the agreement was enforceable at law or not. It was acted upon by the parties in interest and carried out. The respondent further points out that the petitioner corporation was controlled by Finley through his ownership of approximately 50 percent of the stock of the petitioner and that it was in his power to make any contract with the corporation which he might wish to make. It seems plain, however, that Finley desired to own a majority of the stock solely for the purpose of controlling the exclusive sales agency contracts of the manufacturers which Finley had personally obtained and in which he claimed to have a proprietary interest. The contracts were renewable yearly and in most cases could be rescinded by either party upon about 60 days' notice. All of the evidence goes to show that it was immaterial to the manufacturers whether Finley operated as a corporation, a partnership or as sole proprietor. We *199 do not think that there is any basis for a disallowance of the deduction of any part of the compensation paid to Finley upon the ground that it was a distribution of profits to the petitioner's principal stockholder. He owned only a slight majority of the stock and there is no evidence that he acquired the controlling interest for the purpose of receiving profits in diguise as compensation. The respondent further makes the contention that in the computation of the net profits, a percentage of which was payable to Finley, the income taxes payable upon the profits of 1941 should be treated as an expense and that only 25 percent of the net profits computed in this manner should be considered as payable under the agreement. We do not think that this was the contemplation of the parties. In the computation of the net profits the income taxes should not be treated as an expense. The respondent makes the further contention that the net profits as computed by the petitioner were not in accordance with the resolution of the board of directors embodying the agreement which existed between the principal stockholders in that the bonuses paid to the salesmen and some of the keymen were not *200 treated as an expense of the business. The resolution above referred to provided that: The percentage of profits of the Corporation payable to Mr. A. E. Finley, Mr. W. C. Calton and Mr. H. B. Hatch are to be computed after deducting all other expenses of the Corporation, including all other bonus paid. Counsel for the petitioner contends that the resolution was not in accordance with the agreement had between Finley, Mooneyham and Gregory. We sustain the contention of the respondent upon this point. The real reason for respondent's disallowance of $62,253.61 of the compensation paid to Finley appears to be that the amount is excessive for personal services rendered to the extent disallowed. In a different setting there might be merit in this contention. If the agreement had been entered into in 1941 it might be considered that the amount was excessive. But the payment of the compensation was pursuant to an agreement which had been entered into many years prior to 1941 and under such agreement Finley might have received only his fixed compensation or a bonus of a small amount. We think that the reasonableness of the compensation is not to be questioned under the regulations of *201 the Commissioner above quoted. Upon this point the respondent argues that the great increase in business in 1941 was due to the erection of numerous military camps and other war projects in the territory controlled by the petitioner. What the results would have been in the absence of such conditions we can not determine. It was the opinion of Finley that the construction of military camps and other war projects did not figure importantly in the business but that that increase was largely due to other factors. Since the compensation was paid pursuant to the agreement we think it is of no importance that war conditions in a measure enhanced the profits of the petitioner corporation in 1941. As to the excess profits tax issue the question is whether that portion of the loss upon the sale of real estate in 1939 which is allocable to the building should be added back to the income of that year (base period net income) for the purpose of computing petitioner's excess profits tax credit for 1941. Section 711 (b) (1) (J), Internal Revenue Code, provides that in computing the base period net income "deductions of any class shall not be allowed if deductions of such *202 class were abnormal for the taxpayer." Subsection (b) (1) (K) provides that: (ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality * * * is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer. To bring the loss in question under section 711 (b) (1) (J) petitioner must show not only that it was abnormal but that the abnormality was not a consequence of a change in the type, manner of operation, size, or condition of its business. The evidence before us is that the property in question had been used in handling a line of farm machinery and that after one year's trial petitioner decided to discontinue that line of business and sold the property. On that evidence we must conclude that the loss, even if abnormal, was the consequence of a change in the "type, manner of operation, size, or condition of the business engaged in by the taxpayer." We sustain the respondent upon this point. The parties have stipulated that if as a result of the determination of the Tax Court in this proceeding an additional tax for 1941 is determined to be *203 due from the petitioner there is also an additional income tax payable to the State of North Carolina, which tax is a legal deduction from petitioner's gross income. Decision will be entered under Rule 50. Footnotes
*. (11 months)↩